**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GABRIELLE HARPER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CLEO COMMUNICATIONS, INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gabrielle Harper ("Plaintiff"), by and through her undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendant Cleo Communications, Inc. ("Cleo" or "Defendant"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, except as to the allegations specific pertaining to her, which are based on personal knowledge.

## I. INTRODUCTION

1. Plaintiff brings this action against Defendant for its failure to properly secure and safeguard highly valuable, protected, personally identifiable information ("PII") and for its failure to comply with industry standards to protect information systems that contain and/or are utilized to transfer PII. The PII stolen varies depending on each organization that utilizes Cleo's cloud transfer platform. For example, Chicago Public Schools disclosed that an unauthorized party gained access to its students' names, dates of birth, gender, and student ID numbers as well as students' Medicaid ID numbers and dates of program eligibility for those students who are enrolled

in the federal Medicaid program. Chicago Public Schools believe that all current students, and all former students dating back to the 2017-2018 school year were impacted.[1]

2. Cleo is a developer of managed file transfer platforms, which companies use to automate, orchestrate and direct dataflows between businesses and their trading partners which allows them to "address their communication and data exchange requirements effectively".[2] Cleo has more than 4,200 customers that run their businesses on the Cleo Integration Cloud platform.[3]

3. As a manager of a cloud transfer platform, Cleo gathers and stores PII from its customers. Potential Class Members' PII is collected while customers of Cleo utilize its cloud transfer platforms to transmit information to and from their business partners.

4. As a manager of a cloud transfer platform, Cleo therefore knowingly collects and stores sensitive PII from its customers, and has a resulting duty to secure such information from unauthorized access and exfiltration.

5. Cleo expressly recognizes these duties, representing that "commitment to data privacy and security is embedded in every part of our business"[4] and that the "Cleo Integration Cloud is secure and tested against industry standards and is designed for data security and process integrity."[5] Further, Cleo's website links to a "Cleo Trust Center Portal", which allows its

---

1 *Breach Notifications*, Chicago Public Schools (last updated March 7, 2025), https://www.cps.edu/about/policies/student-online-personal-protection-act/breach-notifications/.

2 Aaron Keeports, *EDI vs. API: Why You Need Both for Partner Onboarding*, Cleo, https://www.cleo.com/blog/edi-vs-api?_gl=1*1j6xv8m*_up*MQ..*_gs*MQ..&gclid=Cj0KCQjw4cS-BhDGARIsABg4_J1yzM9SMBnnfgNJunH9lf70OBjs2TkC0FZOQuOsdDeMVcgAqrtrAIsaAsDNEALw_wcB (last visited March 21, 2025).

3 *About Us*, Cleo, https://www.cleo.com/company/about-cleo?_gl=1*1rh713x*_up*MQ..*_gs*MQ..&gclid=Cj0KCQjw4cS-BhDGARIsABg4_J1yzM9SMBnnfgNJunH9lf70OBjs2TkC0FZOQuOsdDeMVcgAqrtrAIsaAsDNEALw_wcB (last visited March 21, 2025).

4 *Cleo Trust Center Portal,* Cleo, https://trustcenter.cleo.com/ (last visited March 21, 2025).

5 *About Us*, *supra* n.3.

customers to "[u]se this portal to learn about our security posture and request access to our security documentation."[6] The portal also provides access to Cleo's certification and compliance audits, vulnerability scans of its software, and its compliance.[7]

6. Despite its duties to safeguard individuals' PII, in October 2024, Cleo disclosed a vulnerability in its file transfer software that allowed unrestricted file uploads and downloads, leading to remote code execution. While Cleo released a patch to fix the vulnerability, the patch did not mitigate the flaw in Cleo's file transfer software.

7. In December 2024, it was discovered that Cleo platforms were again being exploited via a new vulnerability in data theft attacks that allowed attackers to steal data, execute commands, and gain further access to the compromised network (the "Data Breach" or "Breach").[8]

8. Following the December 2024 attack, the CL0P Ransomware Gang took responsibility for the Data Breach and posted the obfuscated names of 66 organizations on their dark web leak site, claiming information was stolen from these companies the vulnerability in Cleo's file transfer software.[9]

9. As a direct and proximate result of Cleo's negligent failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII is now in the hands of cybercriminals.

---

6 *Id*.

7 *Id*.

8 Lawrence Abrams, *Clop ransomware claims responsibility for Cleo data theft attacks*, BleepingComputer (Dec. 15, 2024), https://www.bleepingcomputer.com/news/security/clop-ransomware-claims-responsibility-for-cleo-data-theft-attacks/.

9 *Flash Report: Cl0p Publishes Data of Cleo Compromise Victims*, Zerofox (Jan. 20, 2025), https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/.

10. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII – risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

11. Plaintiff, individually and on behalf the Class as defined herein, brings claims for negligence, negligence *per se*, unjust enrichment, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in Defendant's possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## II. PARTIES

12. Plaintiff Gabrielle Harper is a citizen of the State of Illinois. Plaintiff was a student at a school within the Chicago Public Schools system during the years when student information was exposed. Plaintiff received a Notice of Data Incident letter, dated March 10, 2025, from Chicago Public Schools stating that her PII was compromised by the Data Breach as Cleo is used by the District for Electronic Data Interchange with external entities.

13. Defendant Cleo Communications, Inc. is an Illinois corporation with a principal place of business located at 4949 Harrison Avenue, Suite #200, Rockford, IL 61108.[10]

[10] When subject matter jurisdiction is established under the Class Action Fairness Act, "an LLC's citizenship is based on its principal place of business and laws of incorporation." *Hernandez v. Pure Health Rsch. LLC*, 2023 U.S. Dist. LEXIS 191909, at *7 (S.D. Cal. Oct. 25, 2023) (applying §1332(d)(10) of CAFA) (citing *Jack v. Ring LLC*, 553 F. Supp. 3d 711, 715 (N.D. Cal. 2021)); *see also Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) (noting that §1332(d)(10) of CAFA provides a different rule for unincorporated associations).

## III. JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), the Class Action Fairness Act, because at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

15. This Court has general personal jurisdiction over Defendant because Cleo is a citizen of the State of Illinois.

16. This Court is the proper venue for this action pursuant to 28 U.S.C. §1391(b)(1), because Defendant resides in this District, Defendant is headquartered in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant conducts substantial business within this District.

## IV. FACTUAL BACKGROUND

### A. Cleo Provides Managed File Transfer Services and Collects Highly Sensitive Data.

17. Cleo is a developer and provider of managed file transfer platforms. Over 4,200 organizations utilize Cleo's file transfer services.

18. Cleo is an industry-leading expert that provides solutions that "[d]eliver supply chain and organizational agility" that allows its customers to "meet [their] business commitments and achieve profitable growth."[11]

---

[11] *About Us*, *supra* n.3.

19. Cleo is recognized as a supply chain and cloud services leader, winning various awards as a company leading in tech innovation and creating technology solutions that provide automation, efficiency, and visibility in the supply chain space.[12]

20. Cleo's extensive ecosystem network and pre-built integrations allow for rapid connection to thousands of trading partners worldwide including having featured trading partners such as Amazon, Costco, and Walmart, amongst others.[13]

21. As part of providing its file transfer platforms, Cleo is directly or indirectly entrusted with PII from its customers.

22. When indirect or directly entrusting Cleo with their PII, Plaintiff and Class Members reasonably expect Defendant would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

23. Plaintiff and Class Members had a reasonable expectation, based in part on Cleo's own statements, that their PII would be protected. Cleo represents that "commitment to data privacy and security is embedded in every part of our business."[14] Further, Cleo has a "Cleo Trust Center Portal" that contains, among other things, security audits and vulnerability scans of its software.[15]

---

[12] *Awards and Recognition*, Cleo, https://www.cleo.com/company/awards-recognition?_gl=1*1rh713x*_up*MQ..*_gs*MQ..&gclid=Cj0KCQjw4cS-BhDGARIsABg4_J1yzM9SMBnnfgNJunH9lf70OBjs2TkC0FZOQuOsdDeMVcgAqrtrAIsaAsDNEALw_wcB (last visited March 21, 2025).

[13] *Cleo Network*, Cleo, https://www.cleo.com/trading-partner-network?_gl=1*1vg7pb0*_up*MQ..*_gs*MQ..&gclid=Cj0KCQjw4cS-BhDGARIsABg4_J1yzM9SMBnnfgNJunH9lf70OBjs2TkC0FZOQuOsdDeMVcgAqrtrAIsaAsDNEALw_wcB (last visited March 21, 2025).

[14] *Cleo Trust Center Portal, supra* n.4.

[15] *Id*.

24. However, despite Defendant's stated commitment to data security, Cleo failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII by unauthorized bad actors.

**B. The Data Breach.**

25. In October 2024, Cleo divulged a vulnerability that permitted unrestricted file uploads and downloads-leading to remote code execution targeting the company's LexiCom, VLTrader, and Harmony secure file transfer products. Cleo did not acknowledge its exploitation publicly but released an advisory to its online Solutions Center urging users to upgrade with new security patches. [16]

26. In December 2024, it was discovered that Cleo was still being exploited as the prior security patch did not mitigate the software flaw. The new vulnerability allowed threat actors to upload a JAVA backdoor that allowed attackers to steal data, execute commands, and gain further access to the compromised network. [17]

27. It was discovered that the infamous ransomware gang CL0P – the cybercriminals responsible for other file transfer software attacks in recent years, including Accellion, Fortra, and MOVEit – was behind the Data Breach.[18]

28. In December 2024, CL0P added the obfuscated names of sixty-six alleged victim organizations to the dark web, while threatening that they would reveal the companies' identities if they did not comply with demands. The names of these organizations were revealed on January 14 and 15, 2025 along with a blog post threatening to publish those companies' data. There is a

---

16 Zerofox, *supra* n.9.
17 Abrams, *supra* n.8.
18 *Id*.

likely chance that CL0P will publish the stolen data of those organizations, especially those that CL0P perceives to be impeding negotiations or unlikely intending to meet extortion demands.[19]

29. Indeed, this is CL0P's *modius operandi*. Following CL0P's successful exploitation of a vulnerability in the MOVEit file transfer software, CL0P utilized similar tactics, first naming impacted companies on its dark web site, and then later leaking the stolen information from companies who refused to meet its ransom demands.

30. Between January 17 and 18, 2025, the ransomware group Cl0p published data allegedly belonging to three organizations that were targeted during the Q4 2024 compromise of Cleo secure managed file transfer (MFT) solutions.[20]

31. Following the Data Breach, third party data breach investigation firm Mandiant issued a statement regarding the exploitation of CLEO going back in time to October of 2024:


Charles Carmakal • 2nd
CTO and Board Advisor
3mo • Edited •

+ Follow ···

Mandiant (part of Google Cloud) is actively investigating multiple incidents related to the mass exploitation of two vulnerabilities in Cleo products. Here's a summary of our observations to date.

We are tracking exploitation of both CVE-2024-50623 and CVE-2024-55956 to a cluster that we call UNC5936, which has overlaps with FIN11 (Cl0p). Cl0p has also claimed responsibility for the mass exploitation.
Cl0p is the group that mass exploited, stole data, and extorted victims using Accellion FTA in 2021, SolarWinds Serv-U in 2021, Fortra GoAnywhere in 2023, and Progress Software MOVEit in 2023.
We have not yet observed mass data theft, as was common in prior threat campaigns.
We see the deployment of backdoors, such as BEACON and GOLDTOMB, on exploited systems. It's possible that the group may leverage these backdoors to further compromise the victim environment and deploy ransomware, however, we have not yet observed this in our cases to date.
We have observed exploitation dating back to October 2024. CVE-2024-55956 was initially exploited in the wild as a zero-day.
Exploit code for CVE-2024-50623 is now publicly available, so we expect other threat actors to exploit vulnerable instances.

Given this was initially exploited as a zero-day vulnerability, organizations should forensically examine their Cleo systems to determine if they were already exploited, regardless of when they upgraded the software.

Links to Cleo's security advisories:
https://lnkd.in/ePM5GwJk

---

19 Zerofox, *supra* n.9.
20 *Id.*

32. Upon information and belief, the Data Breach occurred as a direct and proximate result of Cleo's intentional, willful, reckless, and/or negligent failure to implement and follow basic security procedures in order to protect its customers' former, current, and prospective employees' PII. Indeed, Cleo's data security obligations were particularly important given the substantial increase in cyberattacks in recent years, including recent similar attacks against secure file transfer companies such as Accellion and Fortra by the same Russian cyber gang at issue here: CL0P.[21]

33. Therefore, because of the type of data and PII maintained and transferred through its file transfer software, Defendant knew or should have known that its systems and records would be targeted by cybercriminals.

**C. The Value of Private Information and Effects of Unauthorized Disclosure.**

34. Cleo was well aware that the protected PII which it acquires is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

35. Cleo also knew that a breach of its computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

36. These risks are not theoretical, numerous high-profile breaches have occurred at third party services companies such as Blackbaud, Fortra, Snowflake, Progress Software, Change

---

[21] *See* Bill Toulas, *Fortra Shares Findings on GoAnywher MFT Zero-Day Attacks*, BleepingComputer (Apr. 19, 2023), https://www.bleepingcomputer.com/news/security/fortra-shares-findings-on-goanywhere-mft-zero-day-attacks/; *see also* Ionut Ilascu, *Global Accellion Data Breaches Linked to Clop Ransomware Gang*, BleepingComputer (Feb. 22, 2021), https://www.bleepingcomputer.com/news/security/global-accellion-data-breaches-linked-to-clop-ransomware-gang/.

Healthcare, and Accellion, amongst others, in recent years. These breaches put Defendant on notice that its electronic records would be targeted by cybercriminals.

37. PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[22] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

38. Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[23]

39. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[24]

---

[22] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited March 21, 2025).

[23] *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[24] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited March 21, 2025).

40. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

41. The ramifications of Cleo's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

42. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[25]

43. Even if stolen, PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

44. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and

---

[25] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

45. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[26] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[27]

46. A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[28]

47. Due to high-profile data breaches at other companies and its previous data breaches, Defendant knew or should have known that its computer systems would be targeted by cybercriminals.

48. Defendant also knew or should have known the importance of safeguarding the PII with which it was entrusted and of the foreseeable consequences if its data security systems were

---

[26] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[27] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

[28] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

breached. Cleo failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of its customers' former, current, and prospective employees' PII from occurring.

**D. Cleo Failed to Comply with FTC Guidelines and Industry Best Practices.**

49. Cleo is prohibited by the Federal Trade Commission Act, 15 U.S.C. §45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

50. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[29]

51. The FTC recommends that businesses:[30]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

---

[29] *Start with Security: A Guide for Business*, U.S. Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 21, 2025).

[30] *Protecting Personal Information: A Guide for Business*, U.S. Federal Trade Comm'n (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 21, 2025).

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be Cleobled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications – the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from

unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

52. The FTC further recommends business take additional cybersecurity steps, which include:[31]

a. Conducting an inventory of all company devices that store sensitive data, and understanding what types of PII is stored on those devices;

b. Encrypting sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. Crafting a data security plan that involves both physical security (*e.g.*, locking up physical files) and electronic security, and training employees regarding the data security plan;

d. Promptly disposing of PII that is no longer needed, and retaining sensitive data only as long as companies maintain a legitimate business need for the information; and

e. Developing a plan to handle a data breach or data security incident, if and when such an incident occurs.

---

31 *Id.*

53. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

54. Upon information and belief, Cleo failed to properly implement one or more of the basic data security practices described above. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII resulted in the unauthorized access to and exfiltration of Plaintiff's and Class Members' PII.

55. Cleo's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

56. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[32]

57. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[33] Upon information and belief, Cleo failed to adhere to the NIST guidance.

---

[32] *See Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (April 16, 2018), Appendix A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

[33] *Id.* at Table 2 pg. 26-43.

58. Upon information and belief, Defendant's failure to protect Plaintiff's and Class Members' PII is a result of Cleo's failure to adopt reasonable safeguards as required by the FTC, NIST, and industry best practices.

59. Cleo was, at all times, fully aware of its obligations to protect the PII from its customers because of its business model of collecting PII as part of its managed file transfer services. Cleo was also aware of the significant repercussions that would result from its failure to do so.

**E. Plaintiff and Class Members Suffered Damages.**

60. The ramifications of Cleo's failure to keep the PII that it collects from its customers secure are long-lasting and severe. Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

61. In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[34] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to

---

[34] Government Accountability Off., *Data Breaches* (Mar. 2019) https://www.gao.gov/assets/gao-19-230.pdf.

explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like Defendant's, are both time-consuming and of only limited and short-term effectiveness.

62. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[35]

63. Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

64. It must also be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when PIIs stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[36]

65. For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

---

[35] *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last visited March 21, 2025).

[36] *See* 2007 GAO Report, at 29.

66. The value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once it has been compromised, criminals will use them and trade the information on the cyber black market for years thereafter.[37]

67. The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen PII can be used to carry out a variety of crimes.

68. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its customers' former, current, and prospective employees' PII.

69. As a result of Cleo's failures, Plaintiff and Class Members face an increased risk of identity theft and fraud, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

70. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

**F. Plaintiff's Experience.**

71. Plaintiff's was a student at a school within the Chicago Public School system, which utilizes Cleo's file transfer software for Electronic Data Interchange with external entities,

[37] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

during the years of which student information was exposed. In order to enroll at the school, Plaintiff was required to entrust the school with her PII, which then entrusted the PII to Cleo as part of its contract for file transfer services. In collecting and maintaining the Plaintiff's PII, Defendant undertook a duty to act reasonably in its handling of her PII. Cleo, however, did not take reasonable care of Plaintiff's PII, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

72. Plaintiff received a Notice of Data Incident letter, dated March 10, 2025, from Chicago Public Schools stating that her PII was compromised in the Data Breach.

73. Since the announcement of the Data Breach, Plaintiff has been required to spend his valuable time and effort taking steps to mitigate the risk of misuse of her PII. Plaintiff would not have had to engage in these time intensive efforts but for the Data Breach.

74. Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent the misuse of his PII; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

75. Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of crimes, Plaintiff faces a significant, present, and ongoing risk of identity theft and fraud, and other identity-related fraud now and into the indefinite future.

76. In addition, knowing that hackers accessed and likely exfiltrated her PII and that this information likely has been and will be used in the future for identity theft, fraud, and other

nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## V. CLASS ACTION ALLEGATIONS

77. Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States and its territories whose PII was compromised in the Cleo Data Breach which occurred between October 2024 and December 2024 (the "Class").

78. Excluded from the Class are Defendant, its subsidiaries and affiliates, its officers, directors, and members of its officers' and directors' immediate families, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

79. Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

80. **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to, the files implicated in the Data Breach. Upon information and belief, the Class comprises at minimum, hundreds of thousands, of individuals.

81. **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class Members. Such common questions include, but are not limited to:

- Whether and to what extend Defendant had a duty to protect the PII of Plaintiff and Class Members;
- Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII;
- Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;
- Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;
- Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;
- Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;
- Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
- Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and
- Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

82. **Typicality.** Plaintiff' claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same

failure by Defendant to safeguard their PII. Plaintiff and Class Members entrusted Defendant with their PII, and it was subsequently accessed by an unauthorized third party.

83. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

84. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

85. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duties and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

86. **Ascertainability:** Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## VI. CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

87. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

88. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

89. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

90. CLEO's duty to use reasonable care arose from several sources, including but not limited to those described below.

91. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that

is routinely targeted by criminals for unauthorized access, Cleo was obligated to act with reasonable care to protect against these foreseeable threats.

92. Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Cleo's conduct included its failure to adequately restrict access to its computer networks and/or servers that held individuals' PII.

93. Defendant also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach in the financial sector.

94. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Cleo breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

95. But for Cleo's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been access, exfiltrated, and compromised by cybercriminals.

96. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

a. Theft of their PII;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h. Damages to and diminution in value of their PII entrusted to Cleo with the mutual understanding that Defendant would safeguard Plaintiff' and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long

as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

97. As a direct and proximate result of Cleo's negligence, including its gross negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

98. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

99. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Cleo for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duties.

100. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII collected from its customers and not complying with the industry standards. Cleo's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

101. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

102. Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

103. Cleo's violation of Section 5 of the FTC Act constitutes negligence *per se*.

104. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 93 above.

105. As a direct and proximate result of Cleo's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

106. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

107. Plaintiff and Class Members conferred a monetary benefit on Cleo by providing them with their valuable PII.

108. Cleo knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' PII and use of Plaintiff's and Class Members' PII for business purposes.

109. Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

110. Cleo acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

111. If Plaintiff and Class Members had known Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Defendant.

112. Under the circumstances, it would be unjust for Cleo to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

113. Plaintiff and Class Members are without an adequate remedy at law.

114. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 93 above.

115. Plaintiff and Class Members are entitled to restitution and/or damages from Cleo and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

## FOURTH CAUSE OF ACTION
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFPA")**
**815 Ill. Comp. Stat. §§505/1, et seq.**
**(On Behalf of Plaintiff and the Class)**

116. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

117. Plaintiff and Class Members are "consumers" as defined in 815 Ill. Comp. Stat. §505/1(e). Plaintiff, Class Members, and Defendant are "persons" as defined in 815 Ill. Comp. Stat. §505/1(c).

118. Defendant is engaged in "trade or commerce," including th provosion of services, as defined under 815 Ill. Comp. Stat. §505/1(f). Defendant engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. §505/1(b) and (d).

119. Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the ICFPA, including: (1) failing to maintain adequate data security

to keep Plaintiff's and the Class Member's sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (2) failing to disclose or omitting materials facts to Plaintiff and the Class Members regarding their lack of adequate data security and inability or unwillingness to properly secure and protect the PII of Plaintiff and the Class; (3) failing to disclose or omitting materials facts to Plaintiff and the Class Members about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of Plaintiff and the Class Members; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff's and the Class Member's PII from further unauthorized disclosure, release, data breaches, and theft.

120. These actions also constitute deceptive and unfair acts or practices because Defendant knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiff and the Class Members and defeat their reasonable expectations about the security of their PII.

121. Defendant intended that Plaintiff and the Class Members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services

122. Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Class Members. Plaintiff and the Class Members have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

123. Defendant also violated 815 Ill. Comp. Stat. §505/2 by failing to immediately notify Plaintiff and the Class Members of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. §530/1, *et seq*.

124. As a result of Defendant's wrongful conduct, Plaintiff and the Illinois Class Members were injured in that they never would have provided their PII to Defendant, or to the school system that purchased Defendant's services, had they known or been told that Defendant's failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

125. As a direct and proximate result of Defendant's violations of the ICFPA, Plaintiff and the Class Members have suffered harm, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of their PII; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

126. Pursuant to 815 Ill. Comp. Stat. §505/10a(a), Plaintiff and the Illinois Class Members seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the ICFPA.

## FIFTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiff and the Class)

127. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

128. Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

129. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Cleo is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant still possess Plaintiff's and Class Members' PII, and that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

130. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure consumers' PII under the common law and Section 5 of the FTC Act; and

b. Defendant continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

131. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect consumers' PII in their possession.

132. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Cleo. The risk of another such breach is real, immediate, and substantial. If another breach at Cleo occurs, Plaintiff

and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

133. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

134. Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff' reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and

H. Awarding such other and further relief as may be just and proper.

## VIII. JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a jury trial on all claims so triable.

Dated: April 4, 2025

Respectfully submitted,

*s/Joseph P. Guglielmo*
Joseph P. Guglielmo (IL Bar #2759819)
Amanda Rolon (*pro hac vice forthcoming*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-4478
jguglielmo@scott-scott.com
arolon@scott-scott.com

*Attorneys for Plaintiff and the Proposed Class*